Nanette Dembitz, J.
The illegitimate child’s constitutional right to équal treatment with the legitimate child, — a right *166 first recognized by the United States Supreme Court in 1968[1] —is the underlying issue in this proceeding for the support of two illegitimate children by their father.
Respondent father moves to dismiss their mother’s petition on their behalf for their support on the grounds that section 516 of the Family Court Act, dealing with the support of illegitimate children, provides that the performance of a judicially-approved agreement to support them bars any other remedy[2] and that he is performing such an approved agreement. The issue of the constitutionality of the prohibition imposed by section 516 arises because in the case of legitimate children an agreement, though incorporated in a decree, is no bar to a support petition or to a support order for a greater sum than the agreed amount. Since an order in the instant proceeding would require respondent to pay substantially more for his children’s support than he pays under the agreement, the validity of the special bar to suit in the case of illegitimate children is of crucial significance herein. While this court is mindful of caveats against the initial determination of a constitutional question by a lower court, there is no appellate ruling on the constitutionality of section 516 or its predecessor sections, and the issue is inescapably presented in the case at bar.
Briefly summarized, the facts are that respondent father is a physician with an annual income according to his 1975 tax return of over $104,000; he cohabited with petitioner from 1957 to 1968; they resided together as a family with their two sons from their births in 1960 and 1961 to respondent’s separation from petitioner in 1968, respondent supporting *167 petitioner and the children amply during that period. In petitioner’s paternity suit after the separation, a finding of paternity was made on the basis of respondent’s acknowledgment. He and petitioner then executed a support agreement for his payment of $50 a week per child and for various items, which agreement was approved in 1968 by a Judge of this court.
On the basis of precedents and principles discussed in sections I and II below, the court concludes that section 516 is unconstitutional under the equal protection guarantee, as applied to illegitimate children like the instant ones whose paternity was clear at the time of the agreement. A support order is entered (see section IV below and filed supplemental findings) for $135 a week for each child plus $600 a year college tuition for the elder.
I. APPLICATION OF SECTION 516 PROHIBITION TO ACKNOWLEDGED ILLEGITIMATE CHILD.
Petitioner’s attorney suggests that the court need not reach the question of the constitutionality of section 516 because it should be interpreted as inapplicable to the instant case. Although the section in terms covers agreements for all illegitimate children, the suggestion is that it was not intended to bar escalation of an agreed amount where a putative father’s paternity had, as in the instant case, been established prior to the agreement.
Several points can be mustered in support of this interpretation of section 516. The agreements involved in most of the New York cases under that provision and its predecessors have in fact included a denial of paternity;[3] the Decedent Estate Law recognizes the importance of findings of paternity as contrasted with such agreements;[4] and the mother’s promise to refrain from an effort to establish paternity is deemed a consideration for such an agreement.[5] Further, the primary social utility of provisions like section 516 is to secure support *168 for a child whose paternity is in doubt. Finally, an exclusion from the section 516 prohibition, of judicially-approved agreements for children of established paternity, would render it consistent with sections 511 and 545 of the Family Court Act and effectuate their intent. Such sections provide respectively that the court has jurisdiction to order support in any proceeding "in which it makes a finding of paternity” and that "in a proceeding in which the court has made an order of filiation * * * [it] shall direct a father * * * to pay * * * a * * * reasonable sum for the support and education of the child until the child is twenty-one.”
On the other hand, however, to give such an effect to the latter sections would contravene the established and commonsense principle that a specific provision — here section 516— must be given force as an exception to general edicts — here sections 511 and 545. Further, none of the decisions under section 516 or its predecessor sections limit the prohibition, or even suggest its limitation, in the manner proposed by petitioner’s attorney. Nor indeed, so far as research discloses, do decisions under its counterpart provisions in other States; the provision is common, appearing in the Uniform Illegitimacy Act.[6] Particularly since the all-inclusive language of the predecessor statutes to section 516 was carried unchanged into the Family Court Act although that act re-cast paternity proceedings in other respects, a holding that the Legislature had a - silent intent to limit section 516 seems insufficiently supported.
II. CONSTITUTIONALITY OF DISCRIMINATIONS AGAINST ILLEGITIMATES.
Section 516 effects a discrimination against illegitimate as compared to legitimate children in that in the case of legitimate children their support is always subject to escalation on the basis of increased needs of the child or means of the parent. No agreement, though approved by incorporation in a judicial decree or order, is conclusive against them.[7] At best under section 516, the adequacy of provision for the child’s *169 future needs depends on the accuracy of foresight of the parties to the agreement and of the approving Judge; the illegitimate child thus lacks the protection afforded the legitimate of the right to a judicial needs-means determination from time to time during his minority.
Shortly after the United States Supreme Court’s holding in 1968 that it is unconstitutional for "the illegitimate child [to] be denied rights merely because of his birth out of wedlock” (Levy, 391 US, at p 71), the Honorable Justine Wise Polier of this court ruled on the basis thereof that a support agreement should not be approved for an illegitimate child unless it provided for possible escalation on a needs-means basis. (Matter of Storm v None, 57 Misc 2d 342.) While courts of other States have since Levy held invalid a variety of provisions distinguishing between illegitimate and legitimate children,[8] research discloses no consideration of the constitutional implications of a bar-to-suit provision like section 516,[9] except for Judge Polier’s.
In the interim since Levy and Judge Polier’s decision, the United States Supreme Court has held unconstitutional a number of other statutory discriminations against illegitimate children,[10] including that in the Texas child support laws. In the case from Texas the court said: "[O]nce a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a *170 child simply because its natural father has not married its mother.” (Gomez v Perez, 409 US 535, 538.)
This language seems to confirm the wisdom of Judge Polier’s application in Storm of the Levy holding and her view that the limitation of section 516 is constitutionally required. On the other hand, it could be argued that Gomez is distinguishable from the instant case in that the issue there was a State’s complete denial to illegitimate children of a right to paternal support while according it to the legitimate (401 US, at pp 535-536). The instant New York provision obviously recognizes the illegitimate’s right to paternal support — indeed to a judicially-approved measure of it. Further, although the Supreme Court has followed Levy in most of its holdings, it has also upheld by opinion the constitutionality of one discrimination against the illegitimate[11] and affirmed another by an equally divided court.[12] In view of the gravity of a ruling on constitutionality, and since there is no absolute rule prohibiting discrimination between legitimate and illegitimate children, each measure being judged individually,[13] the doctrinal developments since Storm will be reviewed as well as possible justifications for the instant provision.
III. PARTIAL UNCONSTITUTIONALITY OF SECTION 516.
A. STANDARD FOR EVALUATING CONSTITUTIONALITY.
At the outset is the question of the proper standard for determining constitutionality of a differentiation based on legitimacy. The Supreme Court has refrained from holding that such a classification is in the suspect category and sustainable only on the basis of a "compelling” governmental interest.[14] However, an analysis of its decisions shows that a differentiation between illegitimate and legitimate children must be grounded on more than a mere rational connection with a State interest — the minimum basis for compliance with *171 equal protection.[15] The court’s test of the constitutionality of such a classification eschews mere conceptual, possible rationality; instead it requires a realistic consideration of whether the measure will in fact substantially advance the State purpose and also of whether the purpose could be obtained by means other than a discrimination against illegitimates as a class.[16]
Certainly a discrimination against illegitimates has all the hallmarks of the classifications that are to be extirpated to the maximum extent possible by a strict scrutiny of their necessity.[17] For illegitimates are another minority whose inferior status based on an accident of birth and on social prejudice, was concretized in the law.[18]
B. LACK OF JUSTIFICATION FOR SECTION 516.
To consider the justification for section 516’s special bar to support suits, we start with the purpose recognized by the Supreme Court as valid in all the State’s dealings with illegitimacy: the "protection of the family unit,” promotion of the "State’s interest in protecting 'legitimate family relationships’,” and "condemnation of irresponsible liaisons beyond the bonds of marriage.” (Weber, 406 US, at pp 173, 175; see, also, Labine, 401 US, at p 538.) Clearly marriage represents an intention of permanency and a deliberate commitment, which even in the event of divorce is likely to benefit children in terms of the long-term interest of the noncustodial as well as the custodial parent. While the purpose of promoting *172 legitimacy is undoubtedly valid, the provision herein, as in the Supreme Court decisions invalidating discriminations against illegitimate children, does not contribute to that end.
The traditional phrasing of the argument in support of the section 516 bar is that a putative father should be able by an agreement to "buy his peace”[19] — to avoid future claims on behalf of an illegitimate child. Certainly according him that option tends to encourage him rather than to discourage him from illegitimate procreation. Relieving a father of the same liability to escalating support for an illegitimate child as he would have for a legitimate, obviously does not deter him from illegitimacy. Assuming that a woman might be deterred by section 516 from bearing an illegitimate child, from the standpoint of decreasing illegitimacy deterrence of the male is more important than deterrence of the female. For, while the female has available the ultimate preventive of abortion, this female capability is outweighed by the facts that biologically the male is capable of much more rapid and prolonged procreation than the female, and also that the male generally in our culture is the initiator of out-of-wedlock sexual intercourse (other than with a prostitute). A provision which permits a special burden on the female and a lesser burden on the male in regard to an illegitimate as compared to a legitimate child, cannot realistically be expected to curtail illegitimacy.
To discriminate against one group of human beings — illegitimate children — in order to deter another — their parents— seems the antithesis of due process as well as equal protection. But even assuming the State’s interest in deterring illegitimate births could possibly justify a discrimination against those born, the instant provision is realistically "ineffectual” (see Weber, 406 US, at p 176) for that purpose; under the standard of validity here applicable (section A above) it is an unconstitutional means to that end.
The idea that a putative father should have an option to "buy his peace” and avoid escalating support for his child though its mother must continue to meet its needs, expresses an untenable view of their respective responsibility for the child’s birth. Since this allocation of parental duties is unsupportable biologically, it can only express the double standard of sexual behavior that abstinence from out-of-wedlock procre *173 ation is expected of the female but not the male. But, it is outside the State’s power to incorporate standards of private sexual morality in legislation.[20]
Finally, it may be argued that the bar of section 516 to suit supplies an incentive to fathers to execute support agreements for their illegitimate children and that this incentive redounds to the benefit of illegitimate children as a class. However, where the putative father’s paternity is clear, as here, the benefit to a child from agreement is no greater for an illegitimate than a legitimate child.[21] The interest in agreement and settlement instead of litigation must yield to other interests (see McMains v McMains, 15 NY2d 283) — here the public interest in the sufficiency of the child’s support (as to the State’s interest in paternity suits, see Duerr v Wittmann, 5 AD2d 326, 329).[22]
In sum, at least in cases like the instant one where respondent’s paternity and consequent obligation to . illegitimate children is clear, section 516’s prohibition of a suit for support on an escalating needs-means basis is unconstitutional. For the illegitimate child to be treated as second-class in relation to paternal responsibility for support, entitled only to "crumbs from the table,” is no longer tolerable.
The constitutionality of section 516, as applied to an illegitimate child whose paternity has not been acknowledged and is doubtful, should not be decided hypothetically, but should await the presentation of an actual case. For such children it could be argued with more force than in cases of clear paternity, that it benefits the class to provide an incentive to agreement by a bar to suit through the performance of a judicially-approved agreement. (See Krause, Illegitimacy [1971], 150.)[23] With a dubious prospect for judicial enforcement *174 of support, an incentive to agreement may be protective of the child and of the public fisc, which has traditionally been more burdened with responsibility for support for the illegitimate than the legitimate child. (See Matter of Bancroft v Court of Special Sessions, 278 App Div 141, 145 [dissent], affd without opn 303 NY 728.)
IV. APPROPRIATE SUPPORT ORDER.
The major factual issue in controversy is the extent of respondent’s means.
Respondent is a self-employed physician living in a Westchester suburb which is known for its homogenous affluence; he has an office in an eight-apartment building which he owns in an expensive neighborhood (Park Ave. at 64th St.) in Manhattan. He also is the sole manufacturer and distributor of a vitamin product he created. He has no children but the two here involved, nor has his present wife any minor children.
Respondent’s gross income from his business as a physician and payments of interest is, according to his 1975 tax return, $104,768; minus his business expenses and Federal, State and city taxes as shown thereon, his net income amounted to over $51,000.[24] The amount of this income available to meet the children’s needs must be estimated in part on the basis of respondent’s standard of living, since the figures he presented to the court on his expenses lacked credibility.[25] Respondent lives in the same suburban home in which he lived with petitioner until 1968 and it can be presumed, in the absence of any evidence or indication to the contrary, that he there maintains the same standard of living as he did then;[26] at that time he employed a housekeeper, houseman and gardener. Further indications of respondent’s means are that his home was appraised in 1967 at $125,000 and in 1973 at $180,000; *175 respondent’s eight-apartment building at 64th and Park Avenue which he purchased in 1957 for $50,000 had a market value of $350,000 in the 1960’s; the interest on a joint savings account with his wife reported by respondent on his 1975 joint tax return indicates an account of approximately $30,000; a modest estimate of the life insurance he carries (on the basis of his premium payments of $8,400 a year) is $250,000.
The case at bar is similar to Kay v Kay (37 NY2d 632, 636) where the court upheld, on the basis in part of respondent’s prior standard of living, a finding that respondent’s "true income was much higher than his reported” income, and further held that faced with a respondent’s presentation of "evidence which tends to obscure rather than clarify his true economic status, a court is entitled to make an award based upon * * * needs.”
V. STANDARD OF SUPPORT AND ALLOCATION BETWEEN PARENTS.
The parental duty of support requires support of children on a standard of living approximating the parent’s own[27] — a rule which by constitutional necessity applies to illegitimate equally with legitimate children. The children’s standard of living appears moderate compared to respondent’s, and to that they enjoyed during the period they lived with him prior to their parents’ separation. For examples, their expenses include no allowance for summer camp or vacation, and in fact the older boy works as a dishwasher summers and intermittently during the school year; the younger attends public rather than private school and the older a community college. The children’s expenses, as detailed in the additional findings filed herewith, are undoubtedly reasonable in view of respondent’s means.
The remaining question is whether petitioner can and should bear part of the burden of child support. Section 513 of the Family Court Act, continuing predecessor enactments, provides for support of an illegitimate child by both parents. However, even without the benefit of the developments of the past decade in equal protection doctrines, the New York courts held under such a provision that a support order for illegitimate children should take into account the "father’s ability to afford a comfortable or advantageous existence” for *176 them (Schaschlo v Taishoff, 2 NY2d 408, 412), and that the "court may apportion responsibility * * * between father and mother fairly and justly, according to varying circumstances and conditions” (Sheffer v Coffin, 2 AD2d 950, 951). Under these standards it is clear that respondent is obliged to meet his children’s reasonable needs.
Compared to respondent’s net income after taxes and business expenses of over $51,000 a year, petitioner works as a nurse at an annual net salary (after taxes) of $6,000. She has no other income except $4,000 a year gross as dividends on stock in respondent’s vitamin company. She appears to maintain, and on her income could only maintain, the same standard she is requesting for the boys — a relatively modest one compared to respondent’s. Thus, we do not have here the problem of whether a father should contribute to the support of a custodial mother who is not herself entitled to support and cannot support herself on the standard to which the children are entitled.
If section 513 were interpreted as a mandate to the court to allocate part of the burden of child support to petitioner, a constitutional question would again be raised. For section 513 contrasts with sections 413 and 414 of the Family Court Act, which provide in the case of legitimate children for support by the mother only in the event of the father’s "incapability,” death, or disappearance. As pointed out above, the imposition of a special financial burden on the mother with a lightened burden on the father in the case of an illegitimate as compared to a legitimate child, appears explicable only as a residue of a double-standard in sexual behavior — a standard that is more condemnatory of the female than the male for extramarital relations and places a special responsibility on her for a resulting child. An intent to preserve the father’s funds for support of his legitimate children does not appear to have motivated section 513, for a parent’s total responsibilities are considered in the making of all support orders. In any event, neither of the foregoing rationales for section 513 is a constitutional basis for a special rule with regard to support of an illegitimate as compared to a legitimate child.
On the basis of the foregoing considerations and the filed findings as to the children’s reasonable needs, an order of $135 a week is entered for each child plus $600 a year for the college expenses of the elder.

. Levy v Louisiana, 391 US 68; Glona v American Guar. Co., 391 US 73. Pursuant to section 71 of the Executive Law, the Attorney-General was notified of the constitutional issue in this case, but responded that he would not intervene at this stage of the proceedings.

. "§ 516. Agreement or compromise.
"(a) An agreement or compromise made by the mother or by some authorized person on behalf of either the mother or child concerning the support of either is binding upon the mother and child only when the court determines that adequate provision has been made and is fully secured and approves said agreement or compromise.
"(b) No agreement or compromise under this section shall be approved until notice and opportunity to be heard are given to the public welfare official of the county, city or town where the mother resides or the child is found.
"(c) The complete performance of the agreement or compromise, when so approved, bars other remedies of the mother or child for the support and education of the child.”

. See Haag v Barnes, 9 NY2d 554; Matter of Bancroft v Court of Special Sessions, 278 App Div 141, 147, affd without opn 303 NY 728; Matter of ABC v XYZ, 50 Misc 2d 792; Matter of Roe v Doe, 51 Misc 2d 875. But, see, Matter of Arlene C., 37 AD2d 567; Matter of Storm v None, 57 Misc 2d 342.

. EPTL 4-1.2 (subd [3]).

. See Note, The Illegitimate Child Support Contract, 1970 Ariz St Univ LJ 641, 644; Ann 20 ALRSd pp 506, 508, 526-527; State v Bowen, 80 Wn 2d 808; cf. Fox v Hoenshelt, 19 Ore App 617.

. As to other States, see Note cited above at note 70; Rhyne v Katleman, 206 Misc 202, 204, affd 285 App Div 1140; Petit v Ratner, 551 P2d 426 [Nev]; and see Uniform Illegitimacy Act (Uniform State Laws), § 4.

. Van Dyke v Van Dyke, 305 NY 671, affg 278 App Div 446; Langerman v Langerman, 303 NY 465, 468.

. See Kaur v Chawla, 11 Wash App 362; Walker v Walker, 266 So2d 386 (Fla); Matter of Jensen, 162 NW2d 861 (N Dak); E.M.R. v G.E.R., 431 SW2d 152 (Mo). But, see Bastón v Sears, 15 Ohio St 2d 166, upholding statutes limiting right of suit for support of illegitimate child.

. In Petit v Ratner, 551 P2d 426 the highest court of Nevada found it unnecessary to decide the constitutional question, holding that the putative father there had in any event failed to comply with a condition that under its statute was a requirement for a bar to support petitions. In the instant case respondent had complied with the condition prescribed by section 516 for a bar-to-suit that he perform a judicially-approved agreement, insofar as he paid the weekly dollar support provided by the agreement. As to other items of support specified in the agreement, it was unfeasible to determine whether he had, as he claimed, fully performed them since the agreement’s execution and approval in 1968.

. Jimenez v Weinberger, 417 US 628; New Jersey Welfare Rights Organization v Cahill, 411 US 619; Weber v Aetna Cas. & Sur. Co., 406 US 164; Richardson v Gridin and Richardson v Davis, 409 US 1069, affirming opinions holding unconstitutional provisions of the Federal Social Security Act.
See Matter of Hoffman (53 AD2d 55, 66), construing the word "issue” in a will to include illegitimate descendants, "because of the expanding concept of equal protection”.

. Labine v Vincent, 401 US 532.

. Willis v Prudential Ins, Co., 405 US 318. A comment states that the issue there "was whether state or federal law controlled, and the constitutional issue does not appear to have been raised” (Note, Illegitimacy and Equal Protection, 49 NYLJ L Rev 479, 1974). However, this minimization of Willis seems questionable. For the dissenter in the highest court of Georgia relied on the constitutional ruling in Levy (Prudential Ins. Co. v Willis, 227 Ga 619).

. Differentiation even on the "odious” ground of race or ancestry has been upheld under exigent circumstances. (Hirabayashi v United States, 320 US 81,100.)

. See Jimnez, 417 US, at pp 631-632, 638 (Rehnquist, J., dissenting); Weber, 406 US, at pp 175-176.

. See Note cited above, 49 NYU L Rev, at pp 493-500; Dembitz, Law and Morals: The Unmarried Couple and its Children in the Courts, 27 The Record (Bar Assn of NYC, 1972) 518, 519-520.

. See in particular Weber, 406 US, at pp 163-175; Jimnez, 417 US, at pp 636, 639-640 (Rehnquist, J., dissenting).

. The oft-cited Weber case, invalidating a discrimination against illegitimates, defines the test of constitutionality in part in terms of "what fundamental personal rights might the classification endanger?” (406 US, at p 173). The court cites a voting-rights case where it was the exercise of the right to vote that was entitled to special protection (see Harper v Virginia Bd. of Elections, 383 US 663, 670). Nevertheless, it is clear in the illegitimacy cases that the danger is to the right of the illegitimate to equality of treatment in all respects, regardless of the importance of the affected benefit.

. At common law the illegitimate was deemed "no one’s son” (Krause Illegitimacy, 1971, 2; Zepeda v Zepeda, 41 Ill App 2d 240) with no common-law right to paternal support (Schneider v Kennat, 267 App Div 589, 591). Statutory provision for his support developed unevenly. See E.M.R. v G.E.R., 431 SW2d 152 (Mo); Gomez v Perez, above.

. See ABC v XYZ, 50 Misc 2d 792, 794; Rhyne v Katleman, 206 Misc 202, 207, affd 285 App Div 1140; Petit v Ratner, 551 P2d 426, 427 (Nev).

. See Kingsley Pictures Corp. v Regents, 360 US 684, 688-689.

. Cf. Matter of Laiii (38 NY2d 77, 81): "Once that fact [paternity] is established in the formal manner required by the statute, the right of an illegitimate child to inherit from his father is * * * exactly the same as if he had been born in wedlock.”

. As to the argument that men should be enabled by section 516 agreements to protect themselves against harassing paternity and support petitions, this type of harassing suit cannot be singled out for preclusion when such preclusion entails discrimination against illegitimate children as a class.

. See, also, Gomez v Perez, 409 US 535, 538, as to "the lurking problems with respect to paternity;” also Weber v Aetna Cas. & Sur. Co, 406 US 164, 184 (Rehn-Quist, J. dissenting); Note, cited above, 49 NYU L Rev at p 531; consider Matter of Lalli, 38 NY2d 77, 81-82; Matter of Flemm, 85 Misc 2d 855. But, see, Walker v Walker, 266 So2d 385 (Fla) which refused to distinguish an unacknowledged illegiti-
*174 mate from an acknowledged child with regard to the validity of releases to fathers as to support obligations.

. In addition to respondent’s reported income, petitioner’s uncontradicted and credible testimony as to his custom when she lived with him, indicates that he receives a substantial amount of unreported cash.

. Some of the expenses respondent alleged in the monthly expense and income statement he submitted to the court were much greater than the amounts he deducted for the same items on his income tax returns (whose production in evidence he vigorously opposed). Respondent did not present any testimony on his own behalf.

. See Larsen Baking Co. v City of New York, 30 AD2d 400, 406, affd 24 NY2d 1036; Richardson, Evidence (10th ed), § 74, as to the presumption of continuance.

. See De Brauwere v De Brauwere, 203 NY 460, 464-465; also Laumeier v Laumeier, 237 NY 357, 364; Matter of Kotkin v Kerner, 29 AD2d 367, 368-369.